1
2
3
4
5
6
7
8                          **UNITED STATES DISTRICT COURT**
9                          **CENTRAL DISTRICT OF CALIFORNIA**
10
11                                          Case No. 2:22-cv-00812-FWS-JC
12   SECURITIES AND EXCHANGE
     COMMISSION,                            **ORDER GRANTING IN PART AND**
13                                          **DENYING IN PART PLAINTIFF'S**
                         Plaintiff,         **MOTION FOR SUMMARY**
14                                          **JUDGMENT [76] AND DENYING AS**
                                            **MOOT DEFENDANTS' MOTION FOR**
15            v.                            **JURY TRIAL [80] [84]**
16   MICHAEL M. BECK *et al.*,
17
18                       Defendants.
19
20
21
22
23
24
25
26
27
28

Before the court are two matters: (1) Plaintiff Securities and Exchange Commission's ("Plaintiff") Motion for Summary Judgment, (Dkt. 76 ("Motion for Summary Judgment" or "MSJ")); and (2) Defendant Michael M. Beck ("Defendant Beck") and Relief Defendant Helen P. Robinson's ("Relief Defendant Robinson") Motion for Jury Trial, (Dkts. 80, 84 ("Motion for Jury Trial" or "MJT")).[1]   Defendant Beck and Relief Defendant Robinson (collectively, "Defendants") filed several briefs opposing the Motion for Summary Judgment.  (Dkts. 79, 85, 109.)  Plaintiff also filed a Reply, (Dkt. 82 ("Reply")), and Notice of Errata, (Dkt. 102 ("Notice of Errata")).

Plaintiff opposes the Motion for Jury Trial.  (Dkt. 83.)  Defendants also filed several untimely "Responses" in support of their Motion for Jury Trial.  (Dkts. 103, 106.)  The court held oral argument on these matters on February 22, 2024.  (Dkt. 101.)  Based on the record, as applied to the applicable law, the court **GRANTS IN PART AND DENIES IN PART** the Motion for Summary Judgment and **DENIES AS MOOT** the Motion for Jury Trial.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiff initiated this securities action against Defendant Beck and Relief Defendant Robinson on February 7, 2022.  (Dkt. 1 ("Compl.").)  Both Defendant Beck and Relief Defendant Robinson answered the Complaint on March 21, 2022.  (Dkts. 18, 19.)

On August 17, 2023, Plaintiff filed the Motion for Summary Judgment.  (Dkt. 76.)  On August 23 and August 30, 2023, Defendants filed the Motion for Jury Trial.

---

[1] Defendants filed two motions titled "Motion for Jury Trial."  (*See* Dkts. 80, 84.)  Because these two motions are identical, the court treats these filings as a single motion.  *See Brown Jordan Int'l Inc. v. Boles*, 375 F. App'x 700, 701 (9th Cir. 2001) ("[T]he label on a motion has little or no significance.").

(Dkts. 80, 84.)  On September 13, 2023, Defendants requested that the court continue the September 28, 2023, hearing on Plaintiff's Motion for Summary Judgment and Defendants' Motion for Jury Trial so that Defendants could obtain representation. (Dkt. 87.)  At the hearing on September 28, 2023, the court continued the hearings on the Motion for Summary Judgment and Motion for Jury Trial to November 30, 2023. (Dkt. 91.)  On November 30, 2023, the court held a second hearing.  (Dkt. 92.)  At that time, Defendants requested an additional continuance to obtain representation, and the court continued the hearing to February 1, 2024.  (*Id.*)

On January 3, 2024, Defendants filed a letter regarding a criminal indictment against Defendant Beck and requested additional time to prepare for the February 1, 2024, hearing.  (Dkt. 95.)  On January 10, 2024, the court struck Defendants' letter pursuant to Local Rule 83-2.5 and advised Defendants that any request for continuance must be made in accordance with the Federal Rules of Civil Procedure and the Local Rules.  (Dkt. 96.)  On January 22, 2024, Plaintiff filed a status report stating that criminal proceedings have been initiated against Defendant Beck and that the indictment "appears to be based upon the same general conduct alleged in this civil case."  (Dkt. 97 at 2.)  Plaintiff also requested that the court "proceed to rule at least with respect to Defendant Beck's liability when considering the SEC's motion for summary judgment . . . ."  (*Id.*)

On February 1, 2024, the court held a hearing on the Motion for Summary Judgment and Motion for Jury Trial and heard from both parties as to whether: (1) Defendants were ready to proceed with the hearing on the two motions; and (2) the court should stay the civil proceedings pending the outcome of Defendant Beck's criminal proceedings.  (Dkt. 98.)  After hearing from both parties, the court continued the hearing on the Motion for Summary Judgment and Motion for Jury Trial to February 22, 2024, at 10:00 a.m., pending the court's decision as to whether to stay the civil case.  (*Id.*)

On February 14, 2024, the court issued an order declining to stay the case. (Dkt. 99.)  The court then heard oral argument on the Motion for Summary Judgment and Motion for Jury Trial on February 22, 2024.  (Dkt. 101.)  Subsequent to the hearing, Defendants filed four additional documents: two identical memorandums in support of the Motion for Jury Trial, (Dkts. 103, 106), a "Memorandum Opposing Plaintiff's Motion to Exclude Evidence of Ascendiant," (Dkt. 105), and "Objection to Errata," (Dkt. 109).[2]

### B.    Summary of Undisputed Facts

This SEC enforcement action arises from an alleged scalping scheme perpetrated by Defendant Beck.  (*See generally* Compl.)  Defendant Beck has been self-employed since 2016.  (Dkt. 76-2 ("P. SUF") ¶ 1.)  During the relevant period, from 2017 to 2019, Defendant Beck operated a Twitter account with the handle "@BigMoneyMike6," which recommended certain "penny stocks" to his followers. (*Id.* ¶¶ 2, 14, 16, 25–32.)  In 2017, this account had over three million followers.  (*Id.*) Defendant Beck regularly invited his Twitter followers to subscribe to his email group, called "TeamBillionaire," and receive stock recommendations via email.  (*Id.* ¶¶ 17–18.)

Relief Defendant Robinson is Defendant Beck's mother.  (*Id.* ¶¶ 3, 12.) Defendant Beck and Relief Defendant Robinson maintained multiple, separate brokerage accounts; however, Defendant Beck directed Relief Defendant Robinson's stock purchases and sales and received profits from her trades.  (*Id.* ¶¶ 12–13, 25–32.)

---

[2] Defendants' "Objection" to Plaintiff's Notice of Errata states, in relevant part: "The Government offers another false number unsupported by evidence" and "fails to rise to the standard set forth in *Gerhard v. SEC*."[2]  (Dkt. 109 at 1.)  The court finds Defendants' Objection, namely that Plaintiff failed to substantiate its requested relief with appropriate evidence, is redundant of the summary judgment standard, and thus **OVERRULES** the Objection.

Defendant Beck typically selected stocks of issuers trading in "OTC markets" at stock prices less than one dollar.  (*Id.* ¶ 14.)  From 2017 to 2019, Defendant Beck specifically purchased shares, either directly or through Relief Defendant Robinson, from the following eight microcap issuers: Canadian Aerospace Group International, Inc.; the Marquie Group, Inc; Peopleway.com, Inc.; Maison Luxe, Inc.; Pick-Ups Plus, Inc.; United Consortium Ltd.; Vidaroo Corp.; and Zann Corp.  (*Id.* ¶¶ 4–13, 25–32.)

After Defendant Beck purchased shares of these stocks, he conducted stock promotional campaigns that generally followed the same multi-step pattern.  (*Id.* ¶¶ 15–32.)  First, Defendant Beck tweeted that a "stock alert" was forthcoming.  (*Id.* ¶¶ 15, 25–32.)  These "stock alert" tweets typically suggested investors could earn significant returns by stating, for example: "TURN $5k into $100K"; "EXPECT MEGA PROFITS ABOVE 2,000%+"; "TURN UR $1,000 INVESTMENT INTO $20,000"; "TURN UR $5,000 INVESTMENT INTO $10,000"; "WANNA TURN UR $5,000 INVESTMENT INTO $100,000+?"  (*See, e.g.*, *id.* ¶¶ 16, 25–32.)

In most of the promotional campaigns, Defendant Beck then "previewed" his upcoming stock recommendation either by emailing his TeamBillionaire followers or paying a third party to post messages about the stock on the InvestorsHub.com message board.  (*Id.* ¶¶ 18, 20, 25, 29–32.)  On four occasions, Defendant Beck emailed his TeamBillionaire subscribers to provide a preview of his stock recommendation prior to the public Twitter announcement or a reminder about the upcoming Twitter announcement.  (*Id.* ¶¶ 18, 25, 30–32.)  These emails did not inform the TeamBillionaire subscribers that Defendant Beck planned to sell his shares of the stock after sending the email or tweeting the recommendation.  (*Id.* ¶¶ 19, 25, 30–32.)  On a fifth occasion, Defendant Beck paid a third party to post messages about the

stock on the InvestorsHub.com message board prior to the public stock announcement.[3]  (*Id.* ¶¶ 20, 29.)

Next, Defendant Beck publicly announced his stock recommendation on Twitter.  (*Id.* ¶¶ 21, 25-32.)  Like the stock alert tweets, the "stock announcement" tweets touted the recommended stock's profitability by saying, for example: "$MYLI IS GOING TO $10+ (CURRENT PRICE $.44) TURN UR $5,000 INVESTMENT INTO $100,000" or "$VIDA IS CURRENT TRADING AT $.0045 & WILL CLOSE TOMORROW AT $.005, IT'S GUARANTEED TO GO UP 10% A DAY."  (*See, e.g.*, *id.* ¶¶ 22, 25–32.)  The stock announcement tweets did not indicate that Defendant Beck either was already selling shares or planned to sell shares of the recommended stock following the tweet.  (*Id.* ¶¶ 24–32.)  Defendant Beck continued to promote the recommended stocks for periods ranging from one day to six weeks.  (*Id.* ¶¶ 21, 25–32.)  In some instances, Defendant Beck tweeted that he was currently buying the stock he had recommended.  (*See, e.g.*, *id.* ¶¶ 25, 27.)

Then, either the same day as the stock announcement or shortly thereafter, Defendant Beck, directly or through Relief Defendant Robinson, sold substantial amounts of shares in the recommended stocks.  (*Id.* ¶¶ 25–32 & Dkt. 76-53 ("Gullapalli Decl.") ¶¶ 17–22 & Exh. 7.)  Per Plaintiff's expert, Defendant Beck and Relief Defendant Robinson realized at least $572,270.00 in profits through these sales.  (Gullapalli Decl. ¶¶ 17–22 & Exh. 4.)

In June of 2019, Plaintiff subpoenaed Defendant Beck; Defendant Beck has not traded any microcap stocks since he was subpoenaed.  (P. SUF ¶¶ 33–34.)

---

[3] The third party, Justin Chilcote, provided a declaration stating that from 2017 to 2019, Defendant Beck "paid [him] on multiple occasions to post about certain publicly traded companies' stock on investorshub.com."  (Dkt. 76-52 ¶ 6.)  Plaintiff has only provided evidence of Mr. Chilcote posting about one of the penny stocks at issue, "CASG" or Canadian Aerospace International, Inc.  (*See, e.g.*, P. SUF ¶ 29; Dkt. 76-3, Exh. 29.)

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case, and the "substantive law [] identif[ies] which facts are material." *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The moving party bears the initial burden of identifying the elements of the claim or defense on which summary judgment is sought and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party will have the burden of proof at trial, the movant can satisfy its initial burden by demonstrating that there is an absence of evidence to support the non-moving party's case. *Id.* at 325; *see also Horphag Rsch. Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) ("The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact."). The non-moving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation omitted); *see also Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (in opposing summary judgment, "the non-moving party must go beyond the pleadings and by its own evidence 'set forth specific facts showing that there is a genuine issue for trial'"); *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1389 (9th Cir. 1990) ("The non-moving party may not oppose summary judgment by allegations but must show specific trial-worthy facts."). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). "In judging evidence at

the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court must draw all reasonable inferences in the non-moving party's favor. *In re Oracle Corp*, 627 F.3d at 387 (citing *Anderson*, 477 U.S. at 255).

Nevertheless, "inferences are not drawn out of thin air, but from evidence." *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1247 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989). "[S]ummary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248 (internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48; *see also United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978) ("A summary judgment cannot be granted if a genuine issue as to any material fact exists.").

In *In re Oracle Corp.*, the Ninth Circuit described the burdens of proof in the summary judgment process:

> The moving party initially bears the burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. 2548. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. *Id.* at 324, 106 S. Ct. 2548. This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S. Ct. 2505.

627 F.3d at 387.

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990) (citation omitted). "Where no such showing is made, the moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* (cleaned up).

## III.   DISCUSSION

Plaintiff moves for summary judgment with respect to both claims pled against Defendant Beck, namely: (1) fraud in the purchase and sale of securities in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(b), and Rule 10b-5(a)-(c), promulgated thereunder, 17 C.F.R. § 240.10b-5(a)-(c); and (2) fraud in the offer or sale of securities in violation of Section 17(a)(1)-(3) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(1)-(3). (*See* MSJ at 1–2; Compl. ¶¶ 135–43.) Plaintiff also requests injunctive relief, disgorgement, civil penalties, and a penny stock prohibition. (Compl., Prayer for Relief.)

In the opposing briefs, Defendants state only the following:

(1) Defendant and Relief-Defendant object in full to the Government's motion for summary judgment. Genuine issues of material fact and law are at issue. The Defendant never acted with intent to deceive other traders, as required by the charging statutes.

(2) At trial, Defendant and Relief-Defendant will exonerate themselves in full.

(3) Defendant and Relief-Defendant have requested a jury trial, a jury of their peers will agree that no illegal activity occurred.

(*See* Dkt. 79 at 1–2; Dkt. 85 at 1–2 (same).)

Defendants did not submit a statement of genuine issues or provide any evidence in support of their opposition briefs, (*see generally* Dkts. 79, 85), and Plaintiff argues that Defendants do not meaningfully oppose the Motion for Summary Judgment, (Reply at 2–4.)

However, "[a]n unopposed motion for summary judgment does not automatically entitle the movant to judgment as a matter of law." *Sound Found. v. SCI Fund II, LLC*, 658 F. Supp. 3d 929, 938 (D. Ore. 2023); *see also* L.R. 7-12 ("[A] motion pursuant to [Federal Rule of Civil Procedure] 56 may not be granted solely based on the failure to file an opposition."). Likewise, "a nonmoving party's failure to comply with local rules does not excuse the moving party's affirmative duty under Rule 56 to demonstrate its entitlement to judgment as a matter of law." *Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003) (citation omitted). Therefore, "even if the motion is unopposed, the district court must evaluate the evidence presented to determine whether the movant is entitled to judgment as a matter of law." *Sound Found.*, 658 F. Supp. 3d at 938 (citing *Clarendon Am. Ins. Co. v. Jai Thai Enters., LLC*, 625 F. Supp. 2d 1099, 1103, 1108 (W.D. Wash. 2009)). Summary judgment should not be granted where the movant's papers are either "insufficient to support that motion or on their face reveal a genuine issue of material fact." *Henry v. Gill*

*Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  The court proceeds to analyze Plaintiff's evidence with these principles in mind.

### A.   Violations of the Antifraud Provisions

"Section 17(a) of the 1933 Act, Section 10(b) of the 1934 Act, and Rule 10b-5 'forbid making [1] a material misstatement or omission [2] in connection with the offer or sale of a security [3] by means of interstate commerce.'" *SEC v. Phan*, 500 F.3d 895, 907 (9th Cir. 2007) (quoting *SEC v. Dain Rauscher*, 254 F.3d 852, 856 (9th Cir. 2001)).  These antifraud provisions prohibit both "schemes to defraud[] and . . . 'making a material misstatement or omission in connection with the offer or sale of a security by means of interstate commerce.'" *SEC v. Stein*, 906 F.3d 823, 830 (9th Cir. 2018) (quoting *Dain Rauscher*, 254 F.3d at 855–56).  "[V]iolations of Section 17(a)(1), Section 10(b) and Rule 10-b5 require scienter, while violations of Sections 17(a)(2) and (3) require a showing of negligence." *Id.* (citing *Dain Rauscher*, 254 F.3d at 856)*.*  Unlike private parties bringing actions under Section 10(b) and Rule 10b-5, the SEC need not show transaction and loss causation or economic loss. *See Gebhart v. SEC*, 595 F.3d 1034, 1040 n.8 (9th Cir. 2010); *Lorenzo v. SEC*, 587 U.S. ----, 139 S. Ct. 1094, 1104 (2019) ("[T]he Commission, unlike private parties, need not show reliance in its enforcement actions").

Plaintiff argues that Defendant Beck violated the antifraud provisions of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 by engaging in an illegal scalping scheme and making material misrepresentations and omissions.  (MSJ at 14–22.)  "'Scalping' is the 'practice whereby the owner of shares of a security recommends that security for investment and then immediately sells it at a profit upon the rise in the market price which follows the recommendation.'" *SEC v. Abellan*, 674 F. Supp. 2d 1213, 1219 (W.D. Wash. 2009); *see also Lowe v. SEC*, 472 U.S. 181, 224 (1985) (White, J., concurring) (describing "scalping" as conduct in which "a person associated with an advisory service

1    'purchas[es] shares of a security for his own account shortly before recommending
2    that security for long-term investment and then immediately sell[s] the shares at a
3    profit upon the rise in the market price following the recommendation.'") (quoting
4    *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 181 (1963)).

5          The court first considers whether Plaintiff, as the moving party, has
6    demonstrated "the absence of a genuine issue of fact on each issue material to its
7    case," *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480
8    (9th Cir. 2000) (citation omitted), and then considers whether Defendants have raised
9    any genuine issues of material fact, *Celotex Corp.*, 477 U.S. at 323.

### 1.   Material Misstatement or Omission Liability

12         Plaintiff argues Defendant Beck made materially misleading statements and
13   omissions in his emails to TeamBillionaire followers and in his tweets by
14   recommending that his followers or subscribers purchase certain stocks and failing to
15   disclose that he planned to or did sell shares of the recommended stock, either directly
16   or through Relief Defendant Robinson.  (MSJ at 17–18.)

17         "The standard of materiality is an objective one." *United States v. Jenkins*, 633
18   F.3d 788, 802 (9th Cir. 2011) (citing *United States v. Reyes*, 577 F.3d 1069, 1076 (9th
19   Cir. 2009)).  This standard will be "satisfied only if there is 'a substantial likelihood
20   that the disclosure of the omitted fact would have been viewed by the reasonable
21   investor as having significantly altered the total mix of information made available.'"
22   *Phan*, 500 F.3d at 908 (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)).
23   Although "[d]etermining materiality in securities fraud cases 'should ordinarily be left
24   to the trier of fact,'" materiality may appropriately be resolved as a matter of law at
25   summary judgment where "the established omissions are 'so obviously important to
26   an investor that reasonable minds cannot differ on the question of materiality.'" *Id.*
27   (quoting first *In re Apple Comput. Secs. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989),
28   then *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

In this case, Plaintiff's undisputed evidence demonstrates that Defendant Beck conducted a multi-step scalping scheme.  First, Defendant Beck purchased stocks or directed Relief Defendant Robinson to purchase stocks from a microcap issuer; Defendant Beck purchased stock from eight microcap issuers between 2017 and 2019. (*See*, *e.g.*, P. SUF ¶¶ 12–14; Tercero Decl., Exh. 2 ("Beck Depo.") at 93:22–23, 181:11–192:6; *id.*, Exh. 15 ("Robinson Depo") at 65:16–67:23, 112:7–13, 171:20–174:19; *id.*, Exhs. 16–21; Gullapalli Decl., Exh. 6.)

Second, Defendant Beck promoted these stocks using his email and Twitter. Defendant Beck first tweeted and informed his followers that a "stock alert" was forthcoming and then, on four occasions, sent email "previews" of his stock pick to his TeamBillionaire email subscribers.  (*See, e.g.*, P. SUF ¶¶ 15–18, Tercero Decl., Exhs. 3, 23–26, 31.)  The emails did not indicate that Defendant Beck owned, and planned to sell, shares of the stock he recommended subsequent to the email and Twitter promotions.[4]  (*See, e.g.*, P. SUF ¶¶ 18–19, 25, 30–32; Tercero Decl., Exhs. 23–26, 31.)  Defendant Beck also paid an individual to post favorable messages about

---

[4] Some of the emails provided to the court contained sections labeled "full disclosure" or "disclaimer" which stated either: (1) "I have not been paid in shares nor monies to Alert $UCSO.  My staff consists of Due Diligence consultants that solely look for grossly undervalued stocks that will Enrich our NETWORK.  Any shares that I will own will always be bought in the open market.  The #MONEYGANG are promoters, we are a tight-nit network of like-minded investments," (Tercero Decl., Exh. 26 at 7, 13); or (2) "#Teambillionaire has not received any shares/monies for alerting $MYLI. We are a group of due diligence traders that are focused solely on enriching our FAMILY/NETWORK," (*id.*, Exh. 25 at 12).  Because these disclosures did not inform investors that Defendant Beck intended to sell his shares in the stocks he recommended subsequent to his Twitter and email promotions, these statements do not alter the court's materiality analysis.  *See Zweig v. Hearst Corp.*, 594 F.2d 1261, 1268 (9th Cir. 1979) ("[Defendant] should have told his readers of his stock ownership, of his intent to sell shares that he had bought at a discount for a quick profit, and of the practice of having his columns reprinted verbatim as advertisements in the financial journal in which he had an interest.").

1    one of the stocks he planned to recommend on the InvestorsHub.com message board.[5]

2    (*See, e.g.*, P. SUF ¶¶ 20, 29, Tercero Decl. ¶ 35, Exhs. 27–29; Dkt. 76-52 ¶¶ 5–8;

3    Beck Depo. at 54:14–56:16; 155:9–13; 160:6–164:8.)

4         Then, Defendant Beck used Twitter to announce his stock recommendations to

5    his followers and the general public and continued to retweet his recommendations for

6    periods varying from one day to six weeks.  (*See, e.g.*, P. SUF ¶¶ 21–24, 25–32;

7    Tercero Decl., Exh. 3.)  Defendant Beck's tweets frequently highlighted the

8    profitability of his stock recommendations.  (P. SUF ¶¶ 22, 25–32; Tercero Decl.,

9    Exhs. 3, 30.)  However, neither the tweets nor Defendant Beck's occasional follow-up

10   emails to his TeamBillionaire followers stated that Defendant Beck planned to, or

11   already had, sold shares of the recommended stocks.  (*See, e.g.*, P. SUF ¶¶ 21–22, 24–

12   32; Tercero Decl., Exhs. 3, 30, 33–46.)

13        Third, Defendant Beck sold his personal shares of the recommended stocks,

14   often on the same day he tweeted the recommendation or in the time period

15   immediately thereafter.  (*See, e.g.*, P. SUF ¶¶ 25–32; Tercero Decl., Exhs. 16–21;

16   Gullapalli Decl., Exh. 7 & App'x. B.)  Through these stock promotions and

17   subsequent sales of shares, Plaintiff's expert estimates that Defendant Beck realized

18   $572,270.00 in profit.[6]  (*See* Gullapalli Decl. ¶¶ 1, 17–22 & Exh. 4.)

19        In sum, Plaintiff's undisputed evidence demonstrates that Defendant Beck made

20   material misstatements or omission in his emails and tweets by failing to disclose that

21   he owned shares of the stocks he was promoting and planned to sell those shares

22

23   _____

24   [5] The fact that this individual made some of the material misstatements or omissions,
     i.e., those posted on investor message boards, is immaterial to the court's analysis

25   because Defendant Beck paid those third parties to make the statements and omissions
     at issue.  *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142

26   (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity
     with ultimate authority over the statement, including its content and whether and how

27   to communicate it.").

28   [6] The court discusses Ms. Gullapalli's methodology in section III.A.4, *infra*.

subsequent to the promotions.  The court finds Defendant Beck's misrepresentations and nondisclosures in the context of his scalping scheme directly relate to the stocks' profitability and Defendant Beck's purpose in promoting the stocks, and thus were "so obviously important to an investor that reasonable minds cannot differ on the question of materiality."  *Phan*, 500 F.3d at 908; *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency, and profitability is not subject to serious challenge.").

Therefore, like many other courts, the court concludes Plaintiff's evidence showing Defendant Beck scalped stocks without disclosing his ownership or intent to sell is sufficient to meet Plaintiff's initial burden as to materiality.  *See, e.g.*, *SEC v. Sripetch*, 2020 WL 6396927, at *4 (S.D. Cal. Nov. 2, 2020) (finding that defendants' statements and omissions in stock promotions were materially misleading where the statements "did not fully disclose the [d]efendants' then-present intent . . . to sell the promoted stock"); *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1268–69 (9th Cir. 1979) (holding that financial columnist's failure to reveal his practice of "scalping" stocks by "encourag[ing] purchases of securities in the market" while failing to tell "his readers of his stock ownership," and "his intent to sell shares that he had bought at a discount for a quick profit" was a material nondisclosure creating liability under Rule 10b–5); *SEC v. Gallagher*, 2023 WL 6276688, at *12 (S.D.N.Y. Sept. 26, 2023) (finding the SEC plausibly alleged "a reasonable investor would have considered it important in the total mix of information to know that [defendant], at the time he touted the Target Securities, was selling or would soon be selling his own shares in those same issuers"); *SEC v. Reynolds*, 2008 WL 3850550, at *6 (N.D. Tex. Aug. 19, 2008) ("A reasonable investor would likely find the fact that [d]efendants planned to liquidate their stock holdings after elevating the price to be material.  More than that, the fact that [d]efendants were encouraging recipients of promotional mailers and . . . e-mails to buy stock at the same time that they were selling their stock would be material to reasonable investors."); *SEC v. Corp. Rels. Grp., Inc.*, 2003 WL 25570113,

at *8 (M.D. Fla. Mar. 28, 2003) ("[T]he fact that the [defendants] were selling their stock at the same time they were encouraging their readers to buy would clearly be material to reasonable investors," especially where "the timing of the [defendants'] stock sales was tied to the promotional articles" and "the [defendants] were not heeding their own advice about the subject stocks . . . ."); *SEC v. Thompson*, 238 F. Supp. 3d 575, 597 (S.D.N.Y. 2017) (collecting cases).

## 2. Scienter

Plaintiff argues Defendant Beck acted with scienter by: (1) promoting stocks while concealing his intent to sell his stock for personal profit; (2) selling the stocks immediately following the stock promotion campaign, often on the same day; (3) utilizing and controlling Relief Defendant Robinson's brokerage accounts to execute the most profitable trades; and (4) repeatedly engaging in the same scalping pattern over the course of two years . (MSJ at 18–21.)

"[S]cienter refers to 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). Analyzing scienter "is a subjective inquiry," which "turns on the defendant's actual state of mind." *Gebhart*, 595 F.3d at 1042. As a result, "[p]roof of scienter is often based on inference from circumstantial evidence." *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987). "Scienter can be established by intent, knowledge, or in some cases 'recklessness.'" *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010) (citing *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1568–69 (9th Cir. 1990) (en banc)). The "deliberate recklessness" standard entails "'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020)). "[A] reckless omission of

1  material facts satisfies the element of scienter, provided that such recklessness reflects

2  some degree of intentional or conscious misconduct." *Id.* (internal quotation marks

3  and citations omitted).

4      In this case, Plaintiff's undisputed evidence adequately establishes that

5  Defendant Beck acted with scienter.  As discussed above, Plaintiff provided evidence

6  demonstrating that Defendant Beck made material misstatements and omissions

7  through tweets, emails, and paid third-party messages in order to repeatedly scalp

8  stocks of eight different microcap issuers over a two-year period.  (*See, e.g.*, P. SUF

9  ¶¶ 25–32.)  The court finds the timing of Defendant Beck's sales of his (and Relief

10  Defendant Robinson's) personal shares of the recommended stock relative to the

11  timing of his stock promotion campaigns suggests a high degree of scienter or

12  deliberate recklessness.  *See, e.g.*, *Abellan*, 674 F. Supp. 2d at 1219 ("Scienter is also

13  evident where persons engage in 'scalping.'"); *Sripetch*, 2020 WL 6396927, at *5

14  ("Defendants['] . . . repeated pattern over a six-year period of acquiring stock in a

15  company, followed by paying for the promotion of that stock, and then selling that

16  stock at a profit demonstrates at least reckless intent and is sufficient to satisfy the

17  scienter element."); *SEC v. Recycle Tech., Inc.*, 2013 WL 12063952, at *6 (S.D. Fla.

18  Sept. 26, 2013) (finding scienter where "Defendants' newsletters hyped Recycle Tech

19  stock and urged investors to purchase the stock without sufficiently disclosing their

20  intent to immediately sell their shares" and "Defendants' acts of selling their Recycle

21  Tech stock directly contradicted their recommendation to investors to purchase

22  Recycle Tech stock").

23      In addition, Defendant Beck's extensive use of Relief Defendant Robinson's

24  brokerage accounts to execute his most profitable trades, along with Defendants'

25  admissions that Defendant Beck directed "every one of [Relief Defendant Robinson's]

26  trades" and Defendant Beck's subsequent transfer of the trading profits to his own

27  bank accounts, demonstrate Defendant Beck was attempting to conceal his profits.

28  (*See, e.g.*, P. SUF ¶¶ 12–13, 20, 25–32; Beck Depo. at 181:11–192:6; Robinson Depo.

at 65:16–67:23, 84:7–17, 112: 7–13, 171:20–174:19; Gullapalli Decl. ¶¶ 17–22 &

Exhs. 1–8.)  This evidence of Defendant Beck's deceptive conduct further supports

the court's finding of scienter.  *See, e.g.*, *SEC v. Huttoe*, 1998 WL 34078092, at *7

(D.D.C. Sept. 14, 1998) (finding defendant's "actual knowledge of the fraud he was

perpetrating" was "strongly suggested by [his] effort to keep his trading activity secret

by purchasing Dunbar Holdings, a shell corporation in the Bahamas, and by trading

the stocks he scalped under the name of Dunbar Holdings through a Canadian

brokerage account").

Finally, Defendant Beck, himself, acknowledged that scalping, or selling stocks

while simultaneously recommending that his followers purchase the same stock,

would be wrong.  (P. SUF ¶ 35; Beck Depo. at 169:4–9 ("I can't short my own alerts.

That would be – then I would be a bad guy if I shorted my own alerts.")); *see also*

*Platforms Wireless Int'l Corp.*, 617 F.3d at 1094 ("When the defendant is aware of the

facts that made the statement misleading, he cannot ignore the facts and plead

ignorance of the risk.") (internal quotation marks and citation omitted).

Based on this substantial evidence, the court concludes Plaintiff has met its

initial burden of demonstrating that Defendant Beck acted with the requisite scienter.

This finding of scienter is also sufficient to satisfy the state of mind requirement for

Plaintiff's Section 17(a)(3) claim.  *See SEC v. Feng*, 935 F.3d 721, 734 (9th Cir. 2019)

("Although there are differences in the state of mind requirements for Rule 10b-5(b)

and Section 17(a), a showing of intentional or knowing conduct satisfies both.")

(citing *Aaron v. SEC*, 446 U.S. 680, 695–97 (1980)).

### 3. In the Offer or Sale of a Security and in Connection with the Purchase or Sale of a Security in Interstate Commerce

Plaintiff argues that "the purpose of [Defendant] Beck's eight-stock promotion

schemes was to induce others to purchase microcap stocks so that [Defendant] Beck,

who deceptively omitted . . . his plan to sell stock into the inflated market he created,

1   could handsomely profit," and thus the scheme occurred in the offer or sale of

2   securities and in connection with the purchase and sale of securities.  (MSJ at 21–22.)

3   Plaintiff further argues that Defendant Beck's fraudulent conduct occurred in

4   interstate commerce because he used email and the internet to disseminate the stock

5   promotions.  (*Id.* at 22.)

6        With respect to Section 10b and Rule 10b-5, the "in connection with"

7   requirement "is met if the fraud alleged 'somehow touches upon' or has 'some nexus'

8   with 'any securities transaction.'"  *SEC v. Rana Rsch.*, 8 F.3d 1358, 1362 (9th Cir.

9   1993) (quoting *SEC v. Clark*, 915 F.2d 439, 449 (9th Cir. 1990)).  The fraud "must be

10  done to induce the purchase at issue," *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 951 (9th

11  Cir. 2018) (citation omitted), and must be "material to a decision by one or more

12  individuals (other than the fraudster) to buy or sell a 'covered security,'" *Chadbourne*

13  *& Parke LLP v. Troice*, 571 U.S. 377, 387 (2014).  With respect to Section 17(a)

14  claims, the Supreme Court has stated that the terms "in," "offer," and "sale" "are

15  expansive enough to cover the entire selling process."  *United States v. Naftalin*, 441

16  U.S. 768, 772-73 (1979).

17       Plaintiff's undisputed evidence demonstrates that Defendant Beck used his

18  email and Twitter to promote certain stocks in order to induce others to purchase these

19  stocks and artificially inflate the stock prices while he contemporaneously bought and

20  sold the same stocks, either through his or Relief Defendant Robinson's brokerage

21  accounts.  (*See, e.g.*, P. SUF ¶¶ 21–32; Tercero Decl., Exhs. 3, 22, 16–21, 23–26, 31,

22  32–46; Gullapalli Decl., Exh. 4.)  Because "[f]raud touching the intrinsic value of

23  securities and the means of accomplishing the purchase of securities is sufficiently

24  connected with securities transactions to bring the fraud within section 10(b)," *Rana*

25  *Rsch.*, 8 F.3d at 1362, the court finds Plaintiff's evidence satisfies the "in connection

26  with" element.  *See, e.g.*, *Sripetch*, 2020 WL 6396927, at *5 (finding conduct occurred

27  in the offer of and in connection with the sale of securities where "the

28  misrepresentations and omissions at issue were made during promotional campaigns

1  that recommended the purchase of certain stocks"); *Corp. Rels. Grp.*, 2003 WL

2  25570113, at *9 (finding conduct satisfied this element where the defendants "were

3  acquiring stock and then selling that stock while recommending that their readers

4  purchase those same stocks"); *SEC v. Blavin*, 557 F. Supp. 1304, 1310–11 (E.D.

5  Mich. 1983) (finding conduct occurred in the offer of and in connection with the sale

6  of securities where "the sole purpose of the newsletters was to recommend the

7  purchase of certain stock, which was exactly the same stock that [the defendant] was

8  contemporaneously buying and selling").

9        The same evidence demonstrates that Defendant Beck conveyed the

10  misrepresentations and omissions via the instrumentalities of interstate commerce,

11  namely by using websites, email, and Twitter to promote his stock selections and

12  engage with investors.  *See Utah Lighthouse Ministry v. Found. for Apologetic Info. &*

13  *Rsch.*, 527 F.3d 1045, 1054 (10th Cir. 2008) ("[T]he Internet is generally an

14  instrumentality of interstate commerce."); *SEC v. Straub*, 921 F. Supp. 2d 244, 262

15  (S.D.N.Y. 2013) ("[I]t is undisputed that the use of the internet is an 'instrumentality

16  of interstate commerce.'"); *SEC v. Zera Fin. LLC*, 2023 WL 8269775, at *8 (C.D.

17  Cal. Oct. 30, 2023) (finding this element met where "Defendants used Zera's website,

18  social media accounts, and other internet platforms to engage investors").

19  Accordingly, the court concludes Plaintiff has met its initial burden of demonstrating

20  Defendant Beck's material misstatements occurred both in the offer or sale of a

21  security and in connection with the purchase or sale of securities in interstate

22  commerce.  *See Rana Rsch.*, 8 F.3d at 1362; *Naftalin*, 441 U.S. at 772–73.

23              4.    Obtaining Money or Property by Means of Material Misstatements

24        Plaintiff argues that the undisputed evidence demonstrates that Defendant Beck

25  obtained $185,538.00 through trades in his account and $386,732.00 through trades

26  from Relief Defendant Robinson's account, for a total of $572,270.00 from the

27  scalping scheme.  (MSJ at 17–18.)

28

A violation of Section 17(a)(2) requires that the person offering or selling securities "obtain money or property by means of an untrue statement of a material fact or any omission to state a material fact."  15 U.S.C. § 77q(a)(2).  Generally, "Section 17(a)(2)'s 'by means of' limitation means that the defendant's untrue statement or material omission be 'used' to obtain money."  *SEC v. Tolstedt*, 545 F. Supp. 788, 795 (N.D. Cal. 2021) (citing *SEC v. Stoker*, 865 F. Supp. 2d 457, 465 (S.D.N.Y. 2012)).

The court finds the undisputed evidence demonstrates that Defendant Beck used the material misstatements and omissions in his stock promotion campaigns, i.e., the fact that he was simultaneously selling his shares in the stocks he was promoting, to obtain money by artificially inflating stock prices and then selling his shares in the recommended stocks.  (*See, e.g.*, P. SUF ¶¶ 25–32.)  Rachita Gullapalli, a senior financial economist within the SEC's Division of Economic and Risk Analysis, analyzed Defendants' "Blotter Data"[7] for sales of the eight microcap issuers' common stock during the relevant time periods.  (Gullapalli Decl. ¶¶ 1, 17–22 & Exh. 4.) Using the "Last-In-First-Out" methodology,[8] Ms. Gullapalli calculated that Defendant

_____

[7] Blotter Data "provides detailed information about trades performed by a firm in the individual customer's account, including the security's name, date traded, date settled, direction of trade, price, and transaction size."  (Gullapalli Decl. ¶ 17.)  Ms. Gullapalli specifically analyzed Blotter Data files containing trade records for different periods during 2016-2018 for Defendant Beck's brokerage accounts with E-Trade and TD Ameritrade, and during 2017-2019 for Relief Defendant Robinson's accounts with E-Trade, TD Ameritrade, TradeStation Securities, Apex Clearing, Interactive Brokers, and Schwab.  (*Id.* & Exh. 6.)

[8] Ms. Gullapalli describes the Last-In-First-Out methodology as follows:

Under the LIFO method, the investor's first sale of shares is matched to the most recent purchase of shares that precedes the sale, creating a round trip.  The number of shares in the roundtrip is the smaller of the number of shares sold and the number bought.  Besides number of shares traded, each

Beck and Relief Defendant Robinson realized $572,270.00 in profits from the scalping scheme.  (*See id.* ¶ 22 & Exh. 4.)  Thus, the court concludes that Plaintiff met its initial burden of demonstrating that Defendant's materially false misstatements and omissions were "used" to obtain money within the meaning of Section 17(a)(2).  *Tolstedt*, 545 F. Supp. at 795.

>     5.    <u>Scheme Liability</u>

Plaintiff argues Defendant Beck perpetrated a scalping scheme by: (1) purchasing shares of a penny stock, in either his own account or through Relief Defendant Robinson's account; (2) emailing and tweeting publicly that he would soon be issuing a new stock recommendation or a highly profitable "alert"; (3) notifying his email group to encourage subscribers to buy the stock ahead of the upcoming public recommendation; (4) for certain stocks, paying third parties to post favorable commentary on investor message boards prior to Defendant Beck's public recommendation; and, finally, (5) tweeting out recommendations encouraging his Twitter followers and the public to "buy" the recommended stock and continuing to tweet this recommendation as Defendant Beck sold additional shares of the stock. (MSJ at 15–18.)

"The securities fraud provisions . . . prohibit any person, in the offer or sale of securities, 'to employ any device, scheme, or artifice to defraud' or 'to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.'"  *Feng*, 935 F.3d at 736 (quoting 15 U.S.C. §§ 77q(a)(1), (3)).  "[T]hese provisions capture a wide range of conduct," and "dissemination of false or misleading statements with intent to defraud can fall within

---

>     roundtrip has a purchase date, purchase price, sale date and sale price.  The matching happens until either the purchases or sales are exhausted.

(Gullapalli Decl. ¶ 19 (footnote omitted).)

the scope of subsections (a) and (c) of Rule 10b–5, as well as [section 17(a)(1)]." *Lorenzo*, 139 S. Ct. at 1101.  As discussed above, "[t]he state of mind requirement varies among these provisions, but a showing of intentional or knowing conduct clears all thresholds." *Feng*, 935 F.3d at 736 (citing *Aaron*, 446 U.S. at 695–97).

The court finds Plaintiff's undisputed evidence demonstrates that Defendant Beck engaged in conduct that "had the principal purpose and effect of creating a false appearance of fact in furtherance of a scheme." *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds by Simpson v. Homestore.com*, 519 F.3d 1041, 1041–42 (9th Cir. 2008).  Here, Plaintiff's evidence shows that, during the relevant period, Defendant Beck obtained stock in eight different microcap issuers, promoted these stocks to his email and Twitter followers, or, in one instance, through third-party commentary on investor message boards, and then sold his stocks at a profit subsequent to his public recommendations.  (*See, e.g.*, P. SUF ¶¶ 25–32; Tercero Decl., Exhs. 3, 22, 16–21, 23–26, 32–46; Gullapalli Decl. ¶¶ 20–22 & Exhs. 4, 7.)  It is undisputed both that Defendant Beck did not disclose that he was simultaneously selling these stocks after making his public recommendations and obfuscated his profits by conducting the most lucrative trades through Relief Defendant Robinson's brokerage accounts.  (*See, e.g.*, P. SUF ¶¶ 12–13, 20, 25–32; Tercero Decl., Exhs. 3, 22, 16–21, 23–26, 32–46; Beck Depo. at 181:11–192:6; Robinson Depo. at 65:16–67:23, 84:7–17, 112: 7–13, 171:20–174:19; Gullapalli Decl. ¶¶ 17–22 & Exhs. 4, 7, App'x. B.)  It is also undisputed that Defendant Beck conducted the same multi-step scalping scheme numerous times between 2017 and 2019.  (*See, e.g.*, P. SUF ¶¶ 25–32.)  Accordingly, the court concludes Plaintiff has met its initial burden of demonstrating that Defendant Beck employed a device, scheme, or artifice to defraud.  *See, e.g.*, *SEC v. Husain*, 2021 WL 1146381, at *9 (C.D. Cal. Mar. 25, 2021) (finding the "case involve[d] a scheme in the most fundamental sense" because defendants created "a plan with defined, repeated steps . . . executed for a specific purpose " and involving deceitful acts

1 | beyond misstatements and omissions), *reversed in part on other grounds by* 70 F.4th
2 | 1173, 1180 (9th Cir. 2024).

### 6. Summary

In sum, the court finds Plaintiff met its initial burden of demonstrating an absence of genuine issues of material fact with respect to each element of its Section 17(a), Section 10(b), and Rule 10b-5 claims. *C.A.R. Transp. Brokerage Co.*, 213 F.3d at 480; *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to Defendants to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

Viewing the facts in the light most favorable to Defendants, the court finds Defendants have failed to meet their shifted burden. Defendants challenge only the scienter element and repeatedly argue that Defendant Beck "never acted with intent to deceive other traders." (*See, e.g.*, Dkts. 79, 85, 109.) However, Defendants neither dispute Plaintiff's evidence establishing scienter nor provide alternative evidence demonstrating a genuine issue of material fact as to scienter. (*See generally* Dkts. 79, 85, 103, 106, 109.) Because Defendants' argument, standing alone, is insufficient to create a genuine issue of material fact as to scienter, the court concludes Defendants have failed to meet their shifted burden on this element. *See Platforms Wireless Int'l Corp.*, 617 F.3d at 1094 ("[A] defendant ordinarily will not be able to defeat summary judgment by the mere denial of subjective knowledge of the risk that a statement could be misleading"); *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982) ("[A] party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."). Furthermore, since Defendants do not challenge or provide evidence in support of any other elements, the court concludes Defendants have failed to meet their shifted burden on both of Plaintiff's claims.

1   Thus, the court concludes summary judgment is appropriate and **GRANTS** the

2   Motion for Summary Judgment as to both of Plaintiff's claims.  The court proceeds to

3   analyze Plaintiff's requested relief.

### B.    Plaintiff's Requested Relief

6   Plaintiff requests: (1) permanent injunctive relief; (2) disgorgement with

7   prejudgment interest; (3) civil penalties; and (4) a penny stock bar.  (MSJ at 22–29.)

8   Other than Defendants' Objection to the Notice of Errata, discussed above,

9   Defendants do not address Plaintiff's requested relief.  (*See generally* Dkts. 79, 85.)

### 1.    Permanent Injunctive Relief

12  First, Plaintiff requests that the court permanently enjoin Defendant Beck from

13  future violations of securities law pursuant to Sections 20(b) of the Securities Act, 15

14  § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).  (MSJ at 22–23.)

15  Plaintiff argues that a permanent injunction is warranted given Defendant Beck's high

16  level of scienter and lack of contrition.  (*Id.*)

17  "District courts may impose injunctions against any person that 'is engaged or

18  is about to engage in any acts' that may violate the Exchange Act."  *SEC v. Murphy*

19  *(Murphy II)*, 50 F.4th 832, 850 (9th Cir. 2022) (quoting 15 U.S.C. § 78u(d)(1)).  At

20  summary judgment, "a court may issue injunctive relief" only if the record reveals no

21  "genuine issue of fact that is material to the grant of the injunction."  *SEC v. Husain*,

22  70 F.4th 1173, 1180 (9th Cir. 2024) (citing *Murphy*, 626 F.2d at 655).  In considering

23  whether to grant injunctive relief, the district court must "assess the totality of

24  circumstances surrounding the defendant and his violations" using the *Murphy* factors,

25  including: (1) "the degree of scienter involved;" (2) "the isolated or recurrent nature of

26  the infraction;" (3) "the defendant's recognition of the wrongful nature of his

27  conduct;" (4) "the likelihood, because of defendant's professional occupation that

28  future violations may occur;" and (5) "the sincerity of his assurances against future

1    violations." *Murphy*, 626 F.2d at 655.  "The existence of past violations may give rise

2    to an inference that there will be future violations; and the fact that the defendant is

3    currently complying with the securities law does not preclude an injunction." *Id.*

4    (citing *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978)).  The SEC

5    bears "the burden of showing there was a reasonable likelihood of future violations of

6    the securities laws." *Murphy II*, 50 F.4th at 850 (quoting *SEC v. Fehn*, 97 F.3d 1276,

7    1295 (9th Cir. 1996)).

8         The court finds that Plaintiff has demonstrated the *Murphy* factors, on balance,

9    weigh in favor of injunctive relief.  First, as discussed in section III.A.2, *supra*,

10   Defendant Beck's scalping scheme involved a high degree of scienter in that he

11   conducted a multi-step operation numerous times over the course of two years,

12   attempted to hide the scheme's profits by using Relief Defendant Robinson's

13   brokerage accounts, and ultimately caused investors approximately $773,057.00 in

14   actual losses.[9]  *See, e.g.*, *Abellan*, 674 F. Supp. 2d at 1220–21 (finding a high degree

15   of scienter where defendant operated a "well-planned, prolonged scheme" that

16   "deceived the public and caused tangible financial harm").  Second, Defendant Beck's

17   violations were not isolated in nature, but rather repeated occurrences related to eight

18   different microcap issuers over the course of two years.  (*See, e.g.*, P. SUF ¶¶ 25–32.)

19   Third, Defendant Beck has not recognized the wrongfulness of his conduct and

20   continues to deny his participation in and blame others for the scalping scheme.  *See*

21   *SEC v. Sabradaran*, 252 F. Supp. 3d 866, 909 (N.D. Cal. 2020) ("A person's 'lack of

22   remorse' can be 'apparent in' the person's 'continued insistence on the validity of his'

23   conduct that has been found to be in violation of the Securities and Exchange Act.")

24   (quoting *Fehn*, 97 F.3d at 1296).  Fourth, the court finds a "reasonable likelihood" that

25   Defendant Beck may commit future securities violations based on his past conduct

26

27   ─────────────────

28   [9] Ms. Gullapalli estimated investors' actual losses using Blue Sheets Data for each
     microcap issuer during the relevant period.  (*See* Gullapalli Decl. ¶¶ 10–16.)

1   and his position as a self-employed penny stock advisor.  *See Murphy*, 626 F.2d at

2   655.  Fifth, Defendant Beck has not made any assurances against future securities

3   violations.  (*See generally* Dkts. 79, 86, 109.)  Given the totality of the circumstances

4   surrounding Defendant Beck's violations, particularly the likelihood of future

5   violations, the court finds a permanent injunction is warranted.  Accordingly, the court

6   **GRANTS** Plaintiff's request for a permanent injunction.

7                        2.    Disgorgement with Prejudgment Interest

8

9          Plaintiff requests that the court order Defendant Beck to disgorge $572,270.00,

10  equivalent to Defendant Beck's net profits obtained as a result of his securities

11  violations.  (MSJ at 23–26.)  Plaintiff specifically requests that Defendant Beck be

12  held liable for disgorging the full $572,270.00 and Defendant Beck and Relief

13  Defendant Robinson be held jointly and severally liable for $386,732.00 of the

14  disgorgement, or the amount of profits that accrued to Relief Defendant Robinson's

15  brokerage accounts.  (*Id.* at 26; Dkt. 76-54 at 4.)  Plaintiff also seeks $112,062.32 in

16  prejudgment interest from Defendant Beck, with Defendant Beck and Relief

17  Defendant Robinson jointly and severally liable for $75,730.14.  (MSJ at 26; Dkt. 76-

18  54 at 4.)

19                                a.    Defendant Beck

20         "The district court has broad equity powers to order the disgorgement of 'ill-

21  gotten gains' obtained through the violation of the securities laws."  *SEC v. First Pac.*

22  *Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) (citations omitted).  "Disgorgement is

23  designed to deprive a wrongdoer of unjust enrichment, and to deter others from

24  violating securities laws by making violations unprofitable."  *Id.*  The court may order

25  "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded

26  for victims."  *Liu v. SEC*, 591 U.S. ----, 140 S. Ct. 1936, 1940 (2020).  In addition,

27  "courts must deduct legitimate business expenses before ordering disgorgement under

28  § 78u(d)(5)."  *Id.* at 1950.  "The SEC 'bears the ultimate burden of persuasion that its

1    disgorgement figure reasonably approximates the amount of unjust enrichment.'"
2    *Platforms Wireless Int'l Corp.*, 617 F.3d at 1096 (quoting *SEC v. First City Fin.*
3    *Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)).  After the SEC "establishes a
4    reasonable approximation of defendants' actual profits," then "the burden shifts to the
5    defendants to 'demonstrate that the disgorgement figure was not a reasonable
6    approximation." *Id.* (quoting *First City Fin. Corp.*, 890 F.2d at 1232).

7         In *Liu*, the Supreme Court identified three features of disgorgement awards
8    "that test the bounds of equity practice:" (1) "ordering the proceeds of fraud to be
9    deposited in Treasury funds instead of disbursing them to victims"; (2) "imposing
10   joint-and-several disgorgement liability"; and (3) "declining to deduct even legitimate
11   expenses from the receipts of fraud." *Liu*, 140 S. Ct. at 1946.  The first two
12   considerations are implicated by Plaintiff's requested disgorgement.

13        Plaintiff argues that its disgorgement request is appropriate post-*Liu* for three
14   reasons.  First, Plaintiff argues that Congress amended Section 21(d)(7) of the
15   Exchange Act subsequent to *Liu* and omitted the "for the benefit of investors"
16   language; however, Plaintiff does not squarely address the impact of this amendment
17   or the amendment's interplay with *Liu*.  (*See* MSJ at 24–25; Reply at 5.)  Second,
18   Plaintiff argues that numerous courts, in both the Central District and other districts,
19   have found that transferring disgorged funds to the U.S. Treasury is "consistent with
20   equitable principles" when securities fraud victims are not readily identifiable and
21   eventual distribution to investors is unlikely.  (MSJ at 25 (citing four cases); Reply at
22   5 (citing five additional cases).)  Third, in the alternative, Plaintiff notes that it has
23   received stand-by authority to seek a statutory Fair Fund and submits a second
24   proposed order that provides for distribution of the disgorged funds to investors, if
25   feasible, as opposed to transfer to the U.S. Treasury.  (Reply at 6.)
26
27
28

While it is true that Congress amended the Exchange Act in 2021 to omit the "for the benefit of investors" language,[10] among other changes, *see also* William M. (Mac) Thornberry National Defense Authorization Act ("NDAA") for Fiscal Year 2021, Pub. L. No. 116-283, § 6501, 134 Stat 3388 (2021), the impact of the NDAA, and its relationship to *Liu*, remains unclear.[11]  The Ninth Circuit has not addressed whether 15 U.S.C. § 78u(d)(7) overrides any of *Liu*'s requirements, and the other circuit courts to consider the effect of the NDAA have reached conflicting conclusions.  *Compare SEC v. Ahmed*, 72 F.4th 379, 396 (2d Cir. 2023) ("[W]e conclude that disgorgement under § 78u(d)(7) must comport with traditional equitable limitations as recognized in *Liu*."), *and SEC v. Govil*, 86 F.4th 89, 102 (2d Cir. 2023) ("[T]he disgorgement analysis under § 78u(d)(5) and § 78u(d)(7) are the same in that both depend on *Liu*."), *with SEC v. Hallam*, 72 F.4th 316, 338 (5th Cir. 2022) ("As amended, Section 78u(d) authorizes disgorgement in a legal—not equitable—sense. In doing so, it ratifies the pre-*Liu* disgorgement framework used by every circuit court of appeals.").

In the absence of binding precedent explicitly authorizing disgorgement outside of *Liu*'s constraints (or briefing from the parties addressing the NDAA's meaning), the court concludes that *Liu*'s equitable limitations apply with equal force to disgorgement under section 78u(d)(7).  In *Liu*, the Supreme Court characterized

---

[10] *Compare* 15 U.S.C. § 78u(d)(5) ("In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any *equitable relief* that may be appropriate or necessary *for the benefit of investors*.") (emphasis added), *with id.* § 78u(d)(7) ("In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.").

[11] The NDAA applies to this suit.  *See* Pub. L. No. 116-283, § 6501(b) (stating the amendments apply "to any action or proceeding that is pending on, or commenced on or after, the date of enactment [January 1, 2021]").

disgorgement as an equitable remedy.  *See Liu*, 140 S. Ct. at 1942–48.  As the

Supreme Court explained, "Congress does not enlarge the breadth of an equitable

profit-based remedy by simply using the term 'disgorgement' in various statutes"  or

"silently rewrite the scope of what the SEC could recover in a way that would

contravene limitations embedded in the statute."  *Id.* at 1947.  Thus, "'statutory

reference[s]' to a remedy grounded in equity 'must, absent other indication, be

deemed to contain the limitations upon its availability that equity typically imposes.'"

*Id.* (alteration in original) (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534

U.S. 204, 211 n.1 (2002)).  "One of the equitable limitations identified in *Liu* is that

disgorgement must be 'awarded for victims.'"  *Govil*, 86 F.4th at 94 (quoting *Liu*, 140

S. Ct. at 1940); *see also Liu*, 140 S. Ct. at 1948 ("The equitable nature of the profits

remedy generally requires the SEC to return a defendant's gains to wronged investors

for their benefit.").  Because *Liu* treats the equitable limitations outlined therein as

inherent to statutes authorizing disgorgement, including the requirement that

disgorgement be awarded for victims, the court concludes this requirement still

applies to disgorgement under section 78u(d)(7).  *See Govil*, 86 F.4th at 102 ("*Liu* did

not squarely address the meaning of 'appropriate or necessary for the benefit of

investors' in § 78u(d)(5) because it focused on the meaning of 'equitable relief.'

While this language might allow § 78u(d)(5) and § 78u(d)(7) to diverge to some

extent, any divergence . . . is circumscribed by the equitable principles announced in

*Liu*.").

     In any event, the court finds Plaintiff has demonstrated that its requested

disgorgement is consistent with the equitable principles outlined in *Liu* for two

reasons.  First, as discussed in section III.A.4, *supra*, Plaintiff has provided a

reasonable approximation of Defendant Beck's net profits using Ms. Gullapali's

calculations.  (Gullapalli Decl. ¶¶ 17–23 & Exhs. 4, 7.)  Defendants have not

presented any evidence of "legitimate business expenses" that would warrant

deductions from this amount.  *See Liu*, 140 S. Ct. at 1945 ("The Court has carved out

an exception when the 'entire profit of a business undertaking' results from the activity.") (citation omitted); *SEC v. Premier Holding Corp.*, 2022 WL 541194, at *1 (9th Cir. Feb. 23, 2022) (affirming district court's disgorgement calculation where "Defendants failed to meet their burden of proving that any of the purported business expenses were actually incurred or were legitimate . . . .") (internal quotation marks and citation omitted); *SEC v. Russell*, 2023 WL 4946603, at *2 (9th Cir. Aug. 3, 2023) ("Because the only revenues generated by [the business] were the funds unlawfully obtained from investors, [the business's] 'entire profit' arose from [the defendant's] wrongdoing, and the district court was not required to deduct *any* of [the defendant's] business expenses from the investor funds he took in before ordering disgorgement.").

Second, Plaintiff has adequately demonstrated this disgorgement would be "for the benefit of investors" and "consistent with equitable principles."[12]  Plaintiff has provided undisputed evidence demonstrating that victims of Defendant Beck's scalping scheme suffered $773,057.00 in actual losses.  (Gullapalli Decl. ¶¶ 10–16 & Exh. 3.)  Plaintiff also has submitted an alternative proposed judgment that provides for distribution of the disgorged funds to investors, if feasible, upon collection of all or part of the proposed disgorgement, including by potentially utilizing a Fair Fund. (Reply at 6; Dkt. 82-7.)  The court finds the disgorgement outlined in Plaintiff's alternative proposed judgment is both for the benefit of investors and consistent with

---

[12] In *Liu*, the Supreme Court left open the question of whether the SEC's practice of depositing disgorgement funds with the U.S. Treasury would "satisf[y] the SEC's obligation to award relief 'for the benefit of investors'" and be "consistent with equitable principles." *Liu*, 140 S. Ct. at 1948–49.  The Supreme Court framed this question in the context of circumstances "where it is infeasible to distribute the collected funds to investors" or "the wrongdoer's profits cannot practically be disbursed to the victims."  *Id.* at 1949.  Here, Plaintiff acknowledges this framing, (Reply at 5), but does not argue that it would be infeasible to distribute funds to the victims here.  (*See generally* MSJ; Reply.)  Thus, the court does not address whether sending the disgorged funds to the U.S. Treasury would be "for the benefit of investors" and "consistent with equitable principles."

equitable principles.  *See, e.g.*, *SEC v. Almagarby*, 92 F.4th 1306, 1320 (11th Cir. 2024) (holding victim-benefit requirement was met where the SEC "planned to distribute awards to counterparties who had purchased shares from [the defendant] and were negatively affected by the price impact of his selling activity" and an SEC "expert attested that it was possible to track the counterparties to [the defendant's] sales using the 'Electronic Bluesheet System'"); *SEC v. Mizrahi*, 2020 WL 61149112, at *2 (C.D. Cal. Oct. 5, 2020) (finding disgorgement consistent with *Liu* where the SEC planned to return funds to defendant's clients "in proportion to the amount of their losses"); *SEC v. Penn*, 2021 WL 1226978, at *14 (S.D.N.Y. Mar. 31, 2021) (finding SEC's plan to conduct a feasibility analysis and distribute the disgorged money it collects to investors, if feasible, consistent with *Liu*), *aff'd* 2022 WL 2517218 (2d Cir. July 7, 2022).

        *b.*    *Relief Defendant Robinson*

"Courts may also exercise their broad equitable powers to order disgorgement from non-violating third parties," or relief defendants, "who have received proceeds of others' violations to which the third parties have no legitimate claim."[13]  *SEC v. World Cap. Mkt., Inc.*, 864 F.3d 996, 1003-04 (9th Cir. 2017).  A relief defendant "is a person who 'holds the subject matter of the litigation in a subordinate or possessory

---

[13] In an unpublished opinion, the Ninth Circuit stated that "*Liu* did not override our existing case law concerning disgorgement by relief defendants."  *SEC v. Berkeley Healthcare Dynamics, LLC*, 2022 WL 42807, at *2 (9th Cir. Jan. 5, 2022); *see also* Fed. R. App. P. 32-1; CTA9 Rule 36-3.  The panel reasoned that "*Liu* focused on disgorgement of profit," but Ninth Circuit caselaw requires only that relief defendant disgorge "funds not received in exchange for consideration," not profits.  *Id.* (citing *Ross*, 504. F.3d at 1142).  The panel concluded that this approach "provides stronger protection to relief defendants (who need not disgorge any funds to which they have a 'legitimate claim') than *Liu* provides for primary wrongdoers (who must disgorge *all* profits less legitimate expenses)" and "is consistent with the equitable principle emphasized in *Liu* that a remedy should be designed to restore the status quo and avoid being transformed into a penalty."  *Id.* (citing *Liu*, 140 S. Ct. at 1943–44).

capacity as to which there is no dispute.'" *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998) (quoting *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991)). The term relief defendant "is broad enough to encompass persons who are in possession of funds to which they have no rightful claim, such as money that has been fraudulently transferred by the defendant in the underlying securities enforcement action." *World Cap. Mkt.*, 864 F.3d at 1004 (quoting *SEC v. Ross*, 504 F.3d 1130, 1141 (9th Cir. 2007)). To obtain disgorgement against a relief defendant, the SEC must demonstrate that the relief defendant: "(1) received ill-gotten funds and (2) do[es] not have a legitimate claim to those funds." *Id.* (citing *Colello*, 139 F.3d at 677).

The court also finds Plaintiff's requested disgorgement from Relief Defendant Robinson on a joint and several basis is appropriate.[14] Here, Plaintiff's undisputed evidence demonstrates that Relief Defendant Robinson received $386,732.00 in profits to her various brokerage accounts as a result of the scalping scheme. (Gullapalli Decl. ¶¶ 17–23, Exhs. 4, 6, 7; Tercero Decl., Exhs. 17–21.) This evidence "reasonably approximates" Relief Defendant Robinson's gains. In addition, Relief Defendant Robinson testified that: (1) Defendant Beck directed and controlled all of

---

[14] Even if *Liu* applies to a relief defendant, Plaintiff's undisputed evidence discussed herein demonstrates that disgorgement on a joint and several basis would be consistent with equitable principles in this case. *See Liu*, 140 S. Ct. at 1949 (stating that "[t]he common law did . . . permit liability for partners engaged in concerted wrongdoing" and noting that petitioners did not introduce evidence suggesting "one spouse was a mere passive recipient of profits," "that their finances were not commingled," "that one spouse did not enjoy the fruits of the scheme," or "that other circumstances would render a joint-and-several disgorgement order unjust"); *SEC v. Liu*, 2022 WL 3645063, at *3 & n.7 (9th Cir. Aug. 24, 2022) (affirming district court's order of disgorgement on a joint and several basis where defendant "played an integral role in the . . . scheme"); *Ahmed*, 72 F.4th at 408 ("Courts are generally agreed that an innocent person who obtains a benefit through the wrongful act of a third person will be required to make restitution to the one at whose expense the benefit was obtained, unless, in addition to his innocence, the recipient is protected because he gave value.") (quoting George E. Palmer, Law of Restitution § 19.7 (3d ed. 2023)); *SEC v. Bronson*, 602 F. Supp. 3d 599, 618–19 (S.D.N.Y. 2022) (collecting cases).

her stock purchases and sales; (2) she remitted thousands of dollars to Defendant Beck from her brokerage accounts; and (3) Defendants commingled the $386,732 in profits by treating these funds as being equally available or belonging to both Relief Defendant Robinson and Defendant Beck.  (Robinson Depo. at 65:16–67:23; 84:7–17; 112:7–13; 171:20–174:10; 174:15–19 ("Q: Would it be fair to say that just in practice, the way that you've handled this money, what's yours is yours and his and what's his is yours and his?  A: Yes.").)  Defendants have not put forth any evidence suggesting Relief Defendant Robinson received consideration in exchange for the $386,732.00 that accrued to her brokerage accounts.  (*See generally* Dkts. 79, 85.)  Accordingly, the court concludes the undisputed evidence demonstrates that Relief Defendant Robinson received $386,732.00 in ill-gotten funds and does not have a legitimate claim to those funds.  *See World Cap. Mkt.*, 864 F.3d at 1004; *SEC v. Crowd Mach., Inc.*, 2023 WL 8438553, at *6–8 (N.D. Cal. Dec. 5, 2023) (awarding $5,000,000 in disgorgement against relief defendant on joint and several basis).

### c.      Prejudgment Interest

Finally, the court finds Plaintiff's requested prejudgment interest appropriate.  Disgorgement "typically includes prejudgment interest to ensure that wrongdoers do not profit from their illegal conduct."  *SEC v. Rothenberg*, 428 F. Supp. 3d 246, 249–50 (N.D. Cal. 2019) (citing *SEC v. Cross Fin. Servs., Inc.*, 908 F. Supp. 718, 734 (C.D. Cal. 1995)).  In this case, Plaintiff calculated prejudgment interest on a quarterly basis from June 1, 2019, the date Defendant Beck's fraud ended, to June 3, 2023, pursuant to rate provided in 26 U.S.C. § 6621(a)(2).  (Tercero Decl. ¶¶ 42–43 & Exhs. 47–48.)  The Ninth Circuit has affirmed both this interest rate and timeframe for calculating prejudgment interest in civil enforcement actions.  *See Platforms Wireless Intern. Corp.*, 617 F.3d at 1099.

In sum, the court **GRANTS** Plaintiff's request for $575,270.00 in disgorgement from Defendant Beck, with Defendant Beck and Relief Defendant Robinson jointly

and severally liable for $386,732.00 of that disgorgement.  The court also **GRANTS** Plaintiff's request for $112,062.32 in prejudgment interest from Defendant Beck, with Defendant Beck and Relief Defendant Robinson jointly and severally liable for $75,730.14 of that amount.

### 3.   Civil Penalty

Plaintiff requests that the court order Defendant Beck to pay a civil penalty equal to the amount of his gross pecuniary gain, or $572,270.00.  (MSJ at 26–27.) Plaintiff argues the *Murphy* factors weigh "heavily in favor" of a civil penalty because "Defendant Beck's violations were egregious, repeated, and involved a high degree of scienter" and resulted in $773,057.00 in actual losses to investors.  (*Id.* at 27; *see also* Dkt. 102 at 2.)  Plaintiff does not specify which tier of civil penalty it requests but does argue that Defendant Beck committed fraud and his violations resulted in "not just . . . substantial risk of loss, but actual losses to investors."  (*See* MSJ at 27.)

The civil penalty provisions of the Securities Act and the Exchange Act authorize three tiers of "per violation penalties based on either a fixed statutory amount or gross pecuniary gain."  *Murphy II*, 50 F.4th at 847 (citing 15 U.S.C. § 78u(d)(3)(B)(i), (ii)); *see also* 15 U.S.C. § 77t(d)(2)(C).  The statutory tier dictates the maximum penalty based on the severity of the violations.  *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B).  District courts have "discretion to impose civil penalties so long as the amount is within the statutory maximum."  *Murphy II*, 50 F.4th at 847 (citations omitted).  These "'civil penalties are designed to deter the wrongdoer from similar violations in the future,' and courts 'apply the factors set forth in *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980)' to determine the proper penalty."  *Id.* (citing *SEC v. mUrgent Corp.*, 2012 WL 630219, at *2 (C.D. Cal. Feb. 28, 2012)).  As discussed above, the *Murphy* factors include: (1) "the degree of scienter involved;" (2) "the isolated or recurrent nature of the infraction;" (3) "the defendant's recognition of the wrongful nature of his conduct;" (4) "the likelihood, because of defendant's

professional occupation that future violations may occur;" and (5) "the sincerity of his assurances against future violations." *Murphy*, 626 F.2d at 655.  The court must "determine the amount of civil penalties 'in light of the facts and circumstances of the case.'" *Husain*, 70 F.4th at 1184 (citing 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i)). As with injunctive relief, "the district court can impose a civil penalty only after it has determined that no 'genuine issues of material fact exist' and [must resolve] all factual uncertainty . . . in favor of the non-moving party." *Id.* (quoting *SEC v. M & A W.*, 538 F.3d 1043, 1054 (9th Cir. 2008)).

Section 20(d)(2) of the Securities Act and Section 21(d)(3)(A) of the Exchange Act authorize the court to impose a third-tier penalty if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(A).  In this case, the court concludes a third-tier penalty is appropriate because Defendant Beck's scalping scheme involved multiple instances of fraud, *see* section III.A, *supra*, and directly "resulted in substantial losses . . . to other persons," including an estimated $773,057.00 in actual losses to investors.  *See* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(A); *SEC v. Global Express Cap. Real Est. Inv. Fund, I, LLC*, 289 F. App'x 183, 189 (9th Cir. 2008) ("Because [defendant] committed securities fraud, she satisfied the fraud requirement for third tier civil penalties."). Therefore, the court may award the greater of $230,464.00 or "the gross amount of pecuniary gain to [a] defendant as a result of the violation."[15]  *Id.* § 78u(d)(3)(B)(iii); 17 C.F.R. § 201.1001(b).

---

[15] Because Defendant Beck's violations occurred after November 3, 2015, the inflation-adjusted amount for a third-tier violation by a natural person is $230,464.  17 C.F.R. § 201.1001(b); Adjustments to Civil Monetary Penalty Amounts, 89 Fed. Reg. 1970, 1970–72 (Jan. 11, 2024); *see also Husain*, 70 F.4th at 1181 & n.10.

The court next considers the appropriate penalty amount.  As discussed in the context of permanent injunctive relief, the court finds the *Murphy* factors weigh in favor of ordering a significant third-tier civil penalty given that: (1) Defendant Beck's scalping scheme involved a high degree of scienter based on his multi-step, two-year scheme and attempts to hide his profits; (2) Defendant Beck's violations were part of an ongoing pattern of conduct, as opposed to an isolated incident; (3) Defendant Beck has not recognized the wrongfulness of his conduct and continues to deny his participation in and blame others for the scalping scheme; (4) Defendant Beck is likely to commit future securities violations based on his past conduct; and (5) Defendant Beck has not made any assurances against future securities violations.

However, the court's analysis is not limited to the *Murphy* factors. "[D]uring the remedy phase of the proceedings, the district court must consider factors beyond those set forth in *Murphy* if such factors are necessary to 'assess the totality of the circumstances' of [Defendant Beck's] violations." *Husain*, 70 F.4th at 1186 n. 20 (quoting *Murphy II*, 50 F.4th at 849).  In considering the totality of the circumstances, including Defendant Beck's substantial disgorgement obligations, pending criminal proceedings,[16] and self-employment since 2016, which may limit his ability to pay,[17] the court finds the maximum civil penalty amount equivalent to "the gross amount of pecuniary gain" to be unduly harsh in light of the facts and circumstances of this case. *See Murphy II*, 50 F.4th at 849–50 (stating the court "can consider 'whether other penalties may be imposed for the offense' to determine excessiveness") (citing *Pimentel v. City of Los Angeles*, 974. F.3d 917, 923 (9th Cir. 2020)); *SEC v. Findley*, 2024 WL 707264, at *11 (D. Conn. Feb. 21, 2024) (considering same factors and

---

[16] Defendant Beck's criminal indictment, which Plaintiff filed with the court, also includes a request for forfeiture.  (*See* Dkt. 97, Exh. 1 at 11–12.)

[17] Defendant Beck has not submitted any information as to his current financial condition, and thus the court looks only to Plaintiff's evidence on this point.  (*See* Tercero Decl., Exh. 1 (Defendant Beck's questionnaire).)

reducing civil penalty from the maximum permissible because the defendant "would be unable to pay a very high civil penalty, especially in light of the other penalties imposed against him").  Given these extenuating considerations, and because Defendant Beck's conduct "was not so pernicious and wide-ranging to warrant a maximum statutory penalty," *Crowd Mach., Inc.*, 2023 WL 8438553, at *7, the court concludes that a single civil penalty based on the fixed statutory amount, or $230,464.00, is sufficient to deter future misconduct and penalize Defendant Beck's fraudulent conduct committed to date.  *See Murphy II*, 50 F.4th at 849 ("Because the [civil] penalty provision is disjunctive, the district court permissibly calculated the penalty based solely on the fixed statutory value without reference to gross pecuniary gain"); *SEC v. Barry/Bak W. Inc.*, 2023 WL 4491724, at *6 (C.D. Cal. July 12, 2023) (awarding fixed statutory civil penalty "rather than assess[ing] the gross pecuniary gain, which [was] already accounted for the in the disgorgement section").  Accordingly, the court **GRANTS IN PART** the Motion for Summary Judgment as to civil penalty and awards a civil penalty of $230,464.00.

### 4.   Penny Stock Bar

Plaintiff argues the court should permanently bar Defendant Beck from participating in penny stock offerings because Defendant Beck "engaged in a multi-year scheme involving penny stocks wherein he manipulated the trading in the stocks, encouraging others to buy, so that he could sell his shares for a profit."  (MSJ at 27–28.)

"The district court has broad equitable powers to fashion appropriate relief for violations of the federal securities law."  *First Pac. Bancorp.*, 142 F.3d at 1193 (citing *SEC v. Posner*, 16 F.3d 520, 521 (2d Cir. 1994)).  A district court may prohibit an individual "from participating in an offering of penny stock"—an equity security with a price of less than $5.00—"conditionally or unconditionally, and permanently or for such period of time as the court shall determine," when the individual participated in a

penny stock offering at the time of the alleged misconduct.  15 U.S.C. §§ 77t(g)(1), § 78(d)(6)(A).  In considering whether to issue a penny stock bar, the court may consider: "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *First Pac. Bancorp*, 142 F.3d at 1193 (quoting *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995)); *see also SEC v. Premier Holding Corp.*, 2020 WL 8099514, at *10 (C.D. Cal. Nov. 30, 2020) ("The court 'considers essentially the same factors that govern the imposition of an officer or director bar' when imposing a penny stock bar.") (quoting *Abellan*, 674 F. Supp. 2d at 1223).  Finally, the court may also consider "whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might have been sufficient, especially where there was no prior history of unfitness." *Sabradaran*, 252 F. Supp. 3d at 890 (quoting *Patel*, 61 F.3d at 142).

As a preliminary matter, the court finds the securities at issue qualified as penny stock under 17 C.F.R. § 240.3a51-1 during the relevant period.  *See* 17 C.F.R. §§ 240.3a51-1, 242.600(b)(54)-(55); (P. SUF ¶¶ 4–11).  The court further finds the *Pacific Bancorp* factors weigh in favor of imposing a penny stock bar on Defendant Beck.  With respect to the second and fourth factors, the court previously found that Defendant Beck evidenced a high degree of scienter by conducting the scalping scheme on numerous occasions over the court of two years.  *See* section III.A., *supra*. This high degree of scienter coupled with the recurrent nature of Defendant Beck's securities violations demonstrates that the violations were egregious within the meaning of the first *Pacific Bancorp* factor.  *See, e.g.*, *Premier Holding Corp.*, 2020 WL 8099514, at *10 ("[Defendant's] securities violations were egregious given his high degree of scienter."); *Abellan*, 674 F. Supp. at 1223 (issuing permanent penny stock bar where the defendant "organized and carried out a prolonged scheme to

1  defraud investors that involved a high degree of scienter and yielded over $13 million
2  in ill-gotten gains" and "was involved in this scheme at the highest level"); 
3  *Sabradaran*, 252 F. Supp. 3d at 890 ("Courts tend to relate egregiousness to the
4  isolated versus recurrent nature of the misconduct and whether the defendant abused a
5  position of trust to mislead the public.").

6      The court also finds the third, fifth, and sixth factors weigh in favor of a penny
7  stock bar.  As discussed above, Defendant Beck orchestrated each step of the scalping
8  scheme and possessed a significant economic stake in the transactions—he received
9  $572,270.00 in profits by selling his shares after artificially inflating the stock prices.
10  (*See, e.g.*, P. SUF ¶¶ 25–32; Gullapalli Decl. ¶¶ 17–22 & Exh. 4.)  Finally, the court
11  again notes that Defendant Beck has made no assurances regarding future misconduct
12  and remains in a position to perpetrate securities violations through his substantial
13  Twitter and email following.  Accordingly, the court concludes a penny stock bar is
14  warranted.

15      However, the court finds Plaintiff has not adequately demonstrated that
16  Defendant Beck's conduct was so egregious as to warrant a permanent penny stock
17  bar, including by providing any evidence of prior securities violations by Defendant
18  Beck.  *See Sabradaran*, 252 F. Supp. 3d at 890.  In considering the totality of the
19  evidence in this case, the court finds a five-year bar appropriate given the
20  egregiousness of Defendant Beck's misconduct, his degree of scienter and lack of
21  remorse, the central role he played in the scheme, and the likelihood of future
22  violations.  *See, e.g.*, *Premier Holding Corp.*, 2020 WL 8099514, at *10 (collecting
23  cases).  Thus, the Motion for Summary Judgment is **GRANTED IN PART** as to the
24  penny stock bar.

25              **C.    Defendants' Motion for Jury Trial**

26
27      In the Motion for Jury Trial, Defendants argue only that they "are entitled to a
28  trial by jury" and "[t]he interests of justice are served by holding a trial by jury."

(Dkt. 80 at 1; Dkt. 84 at 1.)  "However, the right to a jury trial does not preclude summary judgment on issues where there is no genuine issue as to material facts." *United States v. Rempel*, 202 F. Supp. 2d 1051, 1054 (D. Ala. 2001) (citing Fed. R. Civ. P. 56); *see also In re U.S. Fin. Sec. Litig.*, 609 F.2d 411, 422 n.34 (stating "summary judgment does not violate the Seventh Amendment") (citing *Fidelity & Deposit Co. v. United States*, 187 U.S. 315, 319-21 (1902)).  Because the court finds summary judgment appropriate on Plaintiff's claims and requested relief, the Motion for Jury Trial is **DENIED AS MOOT**.

## IV.   DISPOSITION

For the reasons stated above, the court **GRANTS IN PART AND DENIES IN PART** the Motion for Summary Judgment, (Dkt. 76), and **DENIES AS MOOT** the Motion for Jury Trial, (Dkts. 80, 84).  Because this Order resolves all of Plaintiff's claims against Defendants, the court **VACATES** all remaining pretrial and trial dates, including the pretrial conference set for May 9, 2024.  The court also **ORDERS** Plaintiff to lodge a proposed judgment consistent with this Order within **ten (10) days** of the date of this Order.  Defendants shall then file any objections to the proposed judgment within **ten (10) days** of Plaintiff filing the proposed judgment.

**IT IS SO ORDERED**.

Dated:  March 26, 2024

_____
Hon. Fred W. Slaughter
UNITED STATES DISTRICT JUDGE